# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 10, 2007 Session

## STATE OF TENNESSEE v. VERN BRASWELL

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-03038    Joseph B. Dailey, Judge**

---

**No. W2006-01081-CCA-R3-CD  - Filed January 28, 2008**

---

Defendant, Vern Braswell, was indicted for first degree premeditated murder. Following a jury trial, Defendant was found guilty of the lesser included offense of second degree murder. After a sentencing hearing, Defendant was sentenced as a Range I, standard offender, to twenty-four years. On appeal, Defendant argues that (1) the evidence is insufficient to support his conviction; (2) the trial court erred in certain evidentiary rulings; and (3) his sentence is excessive. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and NORMA MCGEE OGLE, JJ., joined.

Robert L. Parris, Memphis, Tennessee, (on appeal); and J. Bailey and Walter Bailey, Memphis, Tennessee, (at trial), for the appellant, Vern Braswell.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; Betsy Carnesale, Assistant District Attorney General; and Amy Weirich, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

## I. Background

Pauline Washburn testified that her daughter Sheila Braswell, the victim, had been married to Defendant for ten years, and the couple had two young sons. Defendant and the victim resided together with their children in Cordova, Tennessee. Ms. Washburn said that she received a telephone call from Defendant on November 5, 2004, at 4:34 a.m. Defendant told Ms. Washburn that the victim was not breathing. Defendant said that he had fallen asleep around 1:30 a.m., and when he woke up at approximately 3:30 a.m., the victim was floating in the bathtub.

Ms. Washburn drove to her daughter's residence where several people had already gathered. Ms. Washburn and Defendant sat together on the living room couch for a few minutes. Defendant was wearing a white terry cloth robe which was wet. Defendant, who was crying, said that the victim had taken a bath after the couple had sexual intercourse and Defendant had fallen asleep. Defendant said that sometimes after sexual intercourse, the victim's hip would hurt, and she got into the Jacuzzi bathtub to relieve the cramps. Ms. Washburn said that Defendant kept saying, "I should have never let her get in the tub." Ms. Washburn did not understand why Defendant made this statement if a bath after sexual intercourse was not unusual in the victim's routine.

Ms. Washburn said that the victim was approximately four feet, eleven inches tall and weighed between one hundred and twenty-five and one hundred and thirty pounds. Ms. Washburn returned to her daughter's residence the following day to retrieve some of the victim's personal property and clothes for the victim's two sons. Ms. Washburn found some mail in a bag in the kitchen. The mail included a copy of a divorce decree, a request for an order of protection dated April 1996, a one hundred-dollar bill and a twenty-dollar bill, and a check in the amount of $288.50, made payable to the victim's divorce attorney.

Angela Tall Snyder testified that she and the victim worked part-time providing in-home spa treatments. Ms. Snyder stopped by the victim's house on November 4, 2004, at approximately 10:00 p.m. The victim was talking on the telephone. Ms. Snyder said that she stayed approximately thirty minutes and did not see Defendant or his car during this time.

Roosevelt Coleman, a communications supervisor with the Memphis Police Department, maintains the documentation of 911 calls placed to the department's dispatchers. Mr. Coleman said that an event chronology is generated by the computer as soon as a 911 call is received, and a time factor is assigned for the call as soon as possible. The time assigned to Defendant's 911 call was 3:57 a.m. The event was closed at 7:43 a.m. when responding officers were placed back into service. On cross-examination, Mr. Coleman acknowledged that the dispatcher had noted on the event chronology that Defendant was hysterical and screaming during the telephone call.

Lieutenant Fred Jackson, with the Memphis Fire Department, was the first responder to arrive at the crime scene. Defendant was standing outside the residence wearing a white bathrobe. Lieutenant Jackson followed Defendant into the couple's bedroom. The victim was in the adjacent bathroom's bathtub, with the lower part of her body inside the bathtub, and the upper half of her body hanging over the edge. Lieutenant Jackson said that the victim had no visual signs of life. Lieutenant Jackson and an emergency medical technician lifted the victim out of the tub and placed her on the bedroom floor.

Lieutenant Jackson said that he attempted to console Defendant who kept asking what the emergency medical technicians could do for the victim. Lieutenant Jackson stated that Defendant commented that he "shouldn't have let her have that drink or [he] should have awakened [her] or something to that effect." Defendant made and received several cell phone calls while he was with Lieutenant Jackson. Lieutenant Jackson did not remember seeing any children in the home.

Lieutenant Jackson testified that he noticed that the air in the bathroom was humid and moist when he arrived and that the water in the bathtub was warm. Lieutenant Jackson said that the victim was a small woman, and it was not difficult to lift her out of the bathtub. Lieutenant Jackson added that the victim's legs appeared to be stiff.

Baba Tanzy, an emergency medical technician with the Memphis Fire Department, testified that he and a paramedic, Matthew Wayne Hamm, accompanied Lieutenant Jackson to the Defendant's residence. They arrived at approximately 4:00 a.m. Mr. Tanzy said that Defendant told him that the victim had taken a bath around 2:00 a.m. after the couple had sexual intercourse. Defendant woke shortly before 4:00 a.m. and discovered the victim in the bathtub. Mr. Tanzy said that the water in the bathtub was warm when he arrived. Mr. Tanzy noticed small red marks on each side of the victim's neck and broken blood vessels in her eyes, which indicated to Mr. Tanzy that the victim had died by suffocation or asphyxiation. Mr. Tanzy said that the victim's arms were stiff.

Mr. Hamm testified that the victim showed no signs of life when the medical personnel arrived, and she was in rigor mortis. Mr. Hamm stated that the victim had a condition in her eyes known as petechiae which consisted of broken blood vessels in the cornea. Mr. Hamm said that this condition indicated that the victim had suffered a strangulation trauma. Mr. Hamm noted three red marks on the victim's neck and stated that the froth in the victim's mouth indicated the presence of water in the victim's lungs. Mr. Hamm said that the water in the bathtub was hot. He checked the water's temperature at 5:07 a.m. and it measured 94.6 degrees Fahrenheit. Officer David Galloway with the Memphis Police Department testified that the bathtub was five feet, one inch long, and two feet, ten inches deep.

Sergeant Andrew Kjellin, with the Memphis Police Department's felony response unit, arrived at Defendant's home at approximately 5:30 a.m. Defendant told Sergeant Kjellin that his wife had taken a bath after he fell asleep around 1:30 a.m., that he woke up between 3:40 a.m. and 3:50 a.m., and that he discovered the victim in the bathtub. Defendant said that he called a friend named Brian, and then called 911. Defendant told Sergeant Kjellin that he could not lift the victim out of the bathtub. Sergeant Kjellin said that Defendant, in a separate vehicle, followed him back to the police station to make a statement. On cross-examination, Sergeant Kjellin acknowledged that he did not notice any wounds on Defendant, and that there were no signs of a struggle at the crime scene.

Sergeant William D. Merritt, with the Memphis Police Department's homicide squad, testified that Defendant arrived at the police station with a friend on November 5, 2004, between 8:30 and 8:45 a.m. Defendant was advised of his *Miranda* rights and he executed a written waiver of those rights. In his written statement, Defendant said that he and the victim

> were in the Jacuzzi together around midnight. Relaxing and bathing. We began getting intimate and engaging in sex. As a result of an inadequate amount of lubrication, we continued sex in the bedroom and in the bed. At approximately 1:30 a.m. we stopped and joked about who was going to let the water out of the Jacuzzi.

She commented about an aching cramping pain in her abdomen. Then she got up and walked with a limping motion to the bathroom. And shortly thereafter, I heard in the bathroom [the] Jacuzzi faucet, as well as the Jacuzzi jets turn on. At which time or shortly thereafter, I fell asleep. It was approximately 1:30 a.m. to 1:40 a.m. At approximately 3:50ish to 4:00 a.m., I noticed that she wasn't in the bed. I went to check on her and she was somewhat submerged in the water. I called 911 and Brian James as well as a host of other family and friends trying to get help.

Defendant said that the air jets in the bathtub were still operating when he found the victim, and he added that the victim's head and face were under water. Defendant stated that he noticed that "the pink bath pillow with suctions" had detached from the bathtub and was floating in the water. Defendant said that the victim had drunk one twelve-ounce bottle of Skyy Blue malt beverage before midnight and another bottle while they were in the bathtub. Defendant said that it was not unusual for the victim to fall asleep in the bathtub while the air jets were operating. Defendant stated that he attempted to get the victim out of the bathtub but was unsuccessful.

Sergeant Merritt said that Defendant was crying and emotional during the interview, and he received and made several calls on his cell phone while he was at the police station. Sergeant Merritt said that Defendant did not mention that he and the victim had engaged in the practice of erotic asphyxiation that evening. Defendant was arrested on November 6, 2004.

Sergeant Merritt said that after his arrest, Defendant's telephone calls were monitored while he was incarcerated in the county jail. Defendant made approximately thirty-five calls over a two-month period. During the telephone conversations, Defendant commented that "the soldier" was underground. Sergeant Merritt believed that Defendant was referring to his girlfriend, Kristie Woods, and meant that Ms. Woods could not be found. Later, Defendant called Ms. Woods at her place of employment and told her to refer to herself as Defendant's cousin when she called him. Defendant also told Ms. Woods to send him letters at his mother's address. Defendant discussed the victim's life insurance with his mother, who told him that the insurance proceeds were not being released because of the murder investigation. The tape of Defendant's telephone conversations while he was in jail was introduced as an exhibit at trial and played for the jury.

Robert D. Burton, a service manager for Watson's Pools and Spas, explained the operation of a bathtub outfitted with air jets such as the one in Defendant's residence. Mr. Burton testified that after the bathtub is filled with hot water, air is pumped into the water through the jets. The air cools the bath water quickly, and more hot water generally has to be added in approximately fifteen to twenty minutes. Mr. Burton stated that if the air jets in a bathtub ran for two hours, the water would be cold at the end of the period. If the jets were turned off, the water temperature in the bathtub would fall to approximately eighty degrees over a period of two hours.

Benjanette Sturdevant, with Nextel Communications, identified the telephone records pertaining to Defendant's cell phone number. Ms. Sturdevant testified that according to her records, the first call on November 5, 2004, from Defendant's cell phone was placed at 3:55 a.m. and twenty-

five calls were made between 3:55 a.m. and 4:40 a.m. Of these, seventeen calls were made to telephone number 901-737-6100, and two calls were made to telephone number 901-484-8568.

Lieutenant John E. Mitchell, with the Memphis Police Department, testified that he knew Defendant socially and that he and Defendant were members of a professional fraternity, Omega Psi Phi. Lieutenant Mitchell said that his home telephone number was 901-737-6100, and his cell phone number was 901-484-8568. Lieutenant Mitchell said that he was in Texas on November 5, 2004. When he awoke that morning, Lieutenant Mitchell noticed that he had missed several telephone calls from a number reflected on his caller identification. Lieutenant Mitchell dialed that telephone number at approximately 6:00 a.m., and Defendant answered. Defendant was distraught and told Lieutenant Mitchell that his wife was dead. Lieutenant Mitchell was unaware that Defendant had called him numerous times that morning before Lieutenant Mitchell returned the call.

Officer Myron Fair, with the Memphis Police Department, was also a member of the Omega Psi Phi fraternity. Officer Fair discovered that he had missed a telephone call from Defendant on November 5, 2004, which had been made sometime before he woke up. Officer Fair returned the call between 9:00 and 9:30 a.m. Defendant told Officer Fair that he could not talk because he was about to give his statement to the police. Defendant said, "[T]hese people think I killed my wife." Defendant did not mention to Officer Fair or Lieutenant Mitchell that the victim died after engaging in erotic asphyxiation.

Officer Troy Walls, with the Millington Police Department, testified that he responded to a 911 call placed by the victim on April 17, 1996. He found the victim upset and crying when he arrived at arrived at the victim's residence at approximately 11:30 p.m. Officer Walls observed a scratch over the victim's right eye and on her right arm, and her face was flushed. The victim told Officer Walls that Defendant had hit her and held her in a choke hold. There were signs of an altercation in the town house. Officer Walls said that Defendant was not in the house when he arrived, and he advised the victim to obtain a warrant for his arrest.

William Mangum, the custodian of the records for the Shelby County Circuit Court, identified an order of protection against Defendant which was requested by the victim on April 19, 1996. In the protection order, which was introduced as an exhibit at trial, the victim stated that during an argument, Defendant slapped and choked her, cutting off her air supply. An order of protection was entered on May 10, 1996.

Mr. Mangum also identified a complaint for divorce filed by the victim on June 15, 2004. Mr. Mangum said that his records showed that an order for nonsuit was entered in this case on November 9, 2004.

Dr. Joye Maureen Carter performed an autopsy on the victim on November 5, 2004. Dr. Carter was informed before the autopsy began that the victim had died as a result of an accidental drowning. Dr. Carter testified, however, that the victim's neck injuries and the presence of hemorrhaging in her eyes indicated that the cause of death was not an accidental drowning. Dr.

Carter said that the victim had petechiae, or pinpoint hemorrhages, all over her face, including her neck, the lining of the lips, and the gums. Dr. Carter explained that petechiae are caused by an increased pressure on the capillaries.

Dr. Carter observed oval-shaped contusions on the victim's neck. An examination of the interior of the neck revealed patchy hemorrhaging under all six layers of the neck's muscles. Hemorrhaging was also present in the soft tissue of the pharynx. Petechiae were present throughout the voice box and vocal chords. Dr. Carter stated that these injuries were consistent with manual strangulation. The absence of white blood cells at the injury sites indicated that the injuries were recently inflicted.

Dr. Carter said that some water was present in the victim's lungs, but not of a quantity to suggest that the victim's death was caused by drowning rather than strangulation. Dr. Carter acknowledged that it was possible for water to be present in the lungs if the victim was strangled in water. Dr. Carter said that the skin on the bottom of a person's hands and feet wrinkles when submerged in water because the water soaks in between the layers of skin. Dr. Carter said that such wrinkling usually occurs, whether the person is alive or dead, within fifteen to twenty minutes of being submerged in water. Dr. Carter said that an examination of the victim's hands and feet revealed only a minimal amount of wrinkling and did not support a finding that the victim had been submerged in water for a significant length of time.

Dr. Carter said that constant pressure around the neck would lead to death in three to seven minutes. Dr. Carter observed some early signs of rigor mortis when the autopsy was performed at approximately 9:00 a.m. on November 5, 2004. Dr. Carter said it was her understanding that the victim's body had been discovered approximately six hours earlier, and signs of rigor mortis generally became evident approximately six hours after death. Based on her findings, Dr. Carter estimated that the time of death was between the time of the discovery of the body to one or two hours earlier. Dr. Carter stated that no drugs or alcohol were found in the victim's body.

Dr. Carter said that she had performed autopsies on people who had died from erotic asphyxiation. Dr. Carter said that a crime scene investigation was very important to determine if the death resulted from such activity. Dr. Carter said that she usually looked for ligatures, pornography, or signs of a safe escape such as something that needs to be pulled to release the choking. Dr. Carter said that generally the victim is found in the position where they accidentally asphyxiated. Dr. Carter stated that the victim's injuries were not consistent with a death from erotic asphyxiation because there were multiple injuries to the victim's neck muscles as opposed to a pattern made by some type of ligature.

On cross-examination, Dr. Carter acknowledged that there were no fractures present in the victim's thyroid cartilage or hyoid bone, and there were no defensive wounds. The victim's acrylic fingernails were not damaged. Dr. Carter disagreed that the victim's injuries were consistent with the application of a choke hold. Dr. Carter stated that placing the victim in a choke hold by using

the forearm would have inflicted a wider distribution of pressure related injuries as opposed to the individual areas of injury found in the victim's body.

Kristie Woods testified that she met Defendant in the spring of 2002, and the couple dated until the victim's death. Ms. Woods said that she and Defendant were involved sexually during this period of time. Defendant told Ms. Woods that he was married around Thanksgiving 2002, but she decided to continue the relationship. After Ms. Woods graduated from college in 2003, Defendant subsidized the cost of her apartment. In October 2004, Defendant told Ms. Woods that he would "make things right." Ms. Woods believed at this time that Defendant meant that he would leave the victim.

Ms. Woods said that she and Defendant belonged to a social motorcycle club. Defendant also owned a business which rented a facility for parties and gatherings. Ms. Woods helped with the business but was not paid for her services. The funds generated by the rental business were used to support the motorcycle club's activities. Ms. Woods said that she saw the victim at a motorcycle sports track one time when Ms. Woods was with Defendant.

In June 2004, Ms. Woods and Defendant attended a party together. Ms. Woods said that Defendant became upset with her because she was dancing with other people. They argued, and Defendant put his hands around her neck and applied pressure. Defendant told Ms. Woods not to call him anymore. Ms. Woods responded, "okay," and left the party.

Ms. Woods said that she called the victim as she drove away from the party. She told the victim who she was and gave the victim directions to her apartment. After the victim arrived at Ms. Woods' apartment, the two women drove to a local fast food restaurant to talk. Ms. Woods said that Defendant repeatedly called her on her cell phone while she and the victim were talking, but Defendant did not know that Ms. Woods was with the victim. Ms. Woods arrived back at her apartment around 6:00 a.m., and Defendant arrived shortly thereafter. Defendant confronted Ms. Woods about calling the victim and then left. Ms. Woods said Defendant kept calling her after the incident, and a few days later the two resumed their relationship.

In September 2004, Defendant confronted Ms. Woods about a man she had met at a Labor Day party. Defendant obtained a copy of Ms. Woods' telephone records and argued with her when Ms. Woods returned from a weekend trip to Mississippi where the man attended college. Ms. Woods said that Defendant grabbed her by the arms and threw her on the couch, and then banged her head against the wall. Ms. Woods managed to escape his grasp, and they wrestled in front of the couch. Defendant grabbed her by the neck and banged her head against a glass table as he applied pressure to her neck. Ms. Woods said that Defendant then left the apartment.

Ms. Woods acknowledged that she slashed the victim's car tires in September 2004, because she was angry with Defendant. Ms. Woods left the victim $120 in cash in her mailbox to cover the cost of replacing the tires. Ms. Woods said that she resumed her relationship with Defendant after the September altercation and continued to have contact with him after his arrest until June 2005.

Ms. Woods said that she did not know what the term "erotic asphyxia" meant before the trial. Ms. Woods acknowledged that Defendant sometimes placed his forearm against Ms. Woods' neck while they had sexual intercourse. Ms. Woods said that Defendant would apply pressure to her neck but not to a great extent.

Ms. Woods said that Defendant was at her apartment on the evening of November 4, 2004, and left at approximately 8:45 p.m. to meet a repairman at the motorcycle club. Ms. Woods telephoned Defendant between 10:30 and 11:00 p.m. to tell him that she was going to bed. Ms. Woods said that Defendant told her that he was driving home from the club. Ms. Woods acknowledged that she avoided the investigating officers for a period of time after Defendant's arrest.

On cross-examination, Ms. Woods said that her nickname in the motorcycle club was "the soldier." Ms. Woods said that she and Defendant were open about their relationship with the other members of the club, and the victim knew about her relationship with Defendant before Ms. Woods called her in September 2004.

Ms. Woods said that it was not unusual for Defendant to make numerous cell phone calls during any given day. Ms. Woods said that she was not able to reach Defendant immediately on November 5, 2004. When she finally got through, Defendant was crying and hysterical.

Ms. Woods acknowledged that Defendant had not taken any steps to end his marriage during their relationship, and she was under the impression that Defendant and the victim would continue to live together. Ms. Woods said that she was not afraid that Defendant would hurt her. Ms. Woods stated that she was aware of Defendant's reputation in the community and said that Defendant "was always trying to lend a helping hand."

On redirect examination, Ms. Woods said that she did not know either Lieutenant Mitchell or Officer Fair. Ms. Woods admitted that she was not aware of Defendant's altercation with the victim in 1996 which led to the issuance of an order of protection. Ms. Woods said that Defendant told her in June 2004 that the victim had filed for divorce. Ms. Woods added that she was not aware that Defendant had two other prior physical altercations with the victim. Ms. Woods said that she was not aware that Defendant had been convicted of assault in 1990 and misdemeanor theft in 1992. Ms. Woods testified that knowing these facts would change her opinion about Defendant's reputation in the community.

On recross-examination, Ms. Woods said that the victim did not mention any of her prior altercations with Defendant during their conversation in June 2004.

Sheronda Smith, the victim's friend, testified that she and the victim talked to each several times each day by telephone. Ms. Smith talked to the victim at approximately 9:00 p.m. and again at approximately 11:00 p.m. on November 4, 2004. Ms. Smith helped straighten up the victim's bedroom and bathroom during the afternoon of November 5, 2004. Ms. Smith said that the bathtub

was still filled with water. When the water was drained, Ms. Smith found some hair which she believed to be that of the victim and the victim's earrings. Ms. Smith said that she also found what appeared to be another earring in the bottom of the tub. Ms. Smith stated that earlier that afternoon, Defendant told her he had lost his nipple ring. Defendant went into the bedroom to search for the ring but could not find it.

On cross-examination, Ms. Smith said that she accompanied Defendant and the victim to North Carolina. Ms. Smith said that there was a display at the hotel with sadomasochistic overtones, and that Defendant appeared interested in the display. Ms. Smith said that she was aware that Defendant had pierced his nipples.

Vera Cole, Defendant's sister-in-law, testified that the victim came to her house one night between 10:00 p.m. and 11:00 p.m., crying and upset. The victim told Ms. Cole that Defendant had pulled her down a flight of stairs by her hair.

Ms. Cole said that she and her husband had a fight on November 4, 2004, and Mr. Cole left the house without his cell phone. Ms. Cole said that the cell phone rang at approximately 1:36 a.m. and again at 1:38 a.m. Defendant's cell phone number was displayed on the caller identification, so Ms. Cole did not answer the calls. Ms. Cole thought her husband had gone to Defendant's house and was calling her on Defendant's cell phone. On cross-examination, Ms. Cole acknowledged that the two telephone calls did not appear on the telephone records introduced as exhibits but insisted the calls were placed with Defendant's cell phone.

Magra Harden testified that she had known the victim since 1993 when the two women were students at The University of Tennessee. The victim lived with Ms. Harden during the spring and summer of 1995 while Defendant was a patient at a rehabilitation facility in Shelby County. Ms. Harden said that the victim came home one night after visiting Defendant at the facility upset, confused, and distraught. The victim told Ms. Harden that Defendant had choked her during an argument. Ms. Harden said that both sides of the victim's neck were discolored, and the victim's voice was raspy.

Defendant testified on his own behalf. Defendant stated that he and the victim met at a party at college and dated for two or three years before they married. Defendant said he has a master's degree from the University of Memphis in administration and supervision. At the time of the incident, Defendant was the assistant principal at Hanley Elementary School.

Defendant acknowledged that he struck the victim in 1995 during an argument but denied that he dragged her down a flight of stairs. Defendant said that the victim lived with Ms. Harden for a period of time during their marriage, and the victim had an affair during this time. Defendant found some letters from the man and confronted the victim. Defendant said the couple argued and he "snapped." Defendant acknowledged that he hit the victim and held her in a choke hold on this occasion. Defendant said that he did not have any other altercations with the victim prior to her death.

Defendant testified that he and the victim had grown apart when he met Ms. Woods. Defendant said the relationship at first was just sexual, but he and Ms. Woods grew fond of each other. Defendant told Ms. Woods that he was married when the relationship became serious. Defendant stated that Ms. Woods grew obsessive about the relationship during the spring of 2004. Ms. Woods would telephone the victim and hang up. She also sent the victim text messages and e-mail. During the party in June 2004, the victim called Defendant and told him she was still getting messages from Ms. Woods. Defendant grew angry, grabbed Ms. Woods, and told her to leave his family alone. Defendant pushed Ms. Woods away and left the party.

Defendant's tenth wedding anniversary occurred during the Labor Day weekend. Ms. Woods was upset and slashed the victim's tires. Defendant went to Ms. Woods' apartment and confronted her about the incident. Defendant said he grabbed Ms. Woods and told her to leave the victim alone. Defendant denied that he banged Ms. Woods' head against a table or the wall.

Defendant said that he and the victim learned about various sexual practices from pornography and felt their experiments were "adventuresome." Defendant stated that he and the victim frequented a "swingers club" in Shelby County. Defendant added that the victim first suggested that they engage in erotic asphyxiation. Defendant testified that he would get behind the victim and place his arm around her neck, sometimes with his hands against the side of her neck. Defendant said that the victim would signal him with her fingers. If his hold was too tight, the victim would tap her fingers; if his hold was too loose, the victim would pinch him. When her fingers grew limp, Defendant would release his hold. Defendant said that the choking sensation heightened sexual pleasure. Defendant added that after he released his choke hold, he would lay the victim down until she "came around." Defendant said that they had engaged in the practice for approximately two years on a weekly basis.

On November 4, 2004, Defendant attended football practice with his sons, then returned home. Defendant said that he went to his club after dinner to meet a repairman. Defendant left the club at approximately 10:45 p.m. He received a telephone call from Ms. Woods at 10:57 p.m. After he arrived home, Defendant and the victim took a bath together which eventually led to sexual activities. The victim took a bath and then woke Defendant up at approximately 2:45 a.m. The victim asked for a "fixie," her term for erotic asphyxiation. The couple got into the bathtub and turned the air jets on. Defendant said the water was very hot. Defendant proceeded to choke the victim. When her fingers grew limp, he released his hold and laid her back in the water with an inflatable pillow beneath her head. Defendant said that he went to bed and dozed off. He woke up between 3:45 and 3:50 a.m. and noticed that the victim had not come to bed. He went into the bathroom and found the victim submerged in the bath water.

Defendant said that he tried to lift the victim out of the water by grabbing her around the neck area and then around the waist, but he was unsuccessful. Defendant said that every time he let go of the victim, something pulled her back into the water. Defendant believed the victim's hair may have been caught in one of the air jets.

Defendant acknowledged that he made numerous cell phone calls after he discovered the victim's body. He said he called Captain Fifer because Captain Fifer had told Defendant to call him if he ever needed help. Defendant said that he did not tell the investigating officers that he and the victim had engaged in erotic asphyxiation because the victim would not have wanted him to disclose that activity. Defendant said his counsel then advised him not to make any more statements to the police.

Defendant identified several "sex toys" which were present in the couple's bedroom at the time of the incident. Defendant acknowledged that he discussed the victim's insurance policy while he was confined in the county jail. Defendant said his mother asked about the release of the proceeds because she had the custody and care of Defendant's sons. Defendant said that he never intended to end his marriage with the victim. He acknowledged that he had previously attended a rehabilitation facility as a result of alcohol and cocaine abuse. Defendant said that he had been sober for ten years.

Defendant denied that he intentionally killed his wife, or that he choked her to death in anger. When asked if the victim's death was an accident, he responded, "Yes."

On cross-examination, Defendant said that he was five feet, four inches tall and weighed between 170 and 175 pounds at the time of the victim's death. Defendant acknowledged that the victim visited him at the rehabilitation center, but he denied that he choked her on this occasion. Defendant said that his relationship with Ms. Woods ended in June or July, 2004. Defendant conceded he continued to see Ms. Woods on a friendship basis. Defendant acknowledged that there were two bottles of Skyy Blue malt beverage in the bedroom and bathroom, and he said that the victim drank the alcohol. Defendant said that he later found his nipple ring inside his shirt, and the ring was not the one found in the bathtub after the victim's death.

Dr. Mark Schwartz testified that he is a psychologist, with a doctor of science degree, specializing in sexual and relational therapy. Dr. Schwartz is also a member of the faculty of the St. Louis University's Department of Psychiatry and teaches a course in sexual medicine. Dr. Schwartz's specialty has been in the areas of sexual trauma, sexual deviation, and sexual offenders. Dr. Schwartz defined erotic asphyxiation as the limiting of oxygen to the brain during orgasm. The activity decreases dopamine, increases the endorphin, and enhances sexual arousal. Like most addictions, participants develop a tolerance level which leads to increased risk taking and increased risk of death or an accident. Participants also engage in the activity with increased frequency.

Dr. Schwartz said that he met with Defendant for two and one-half hours the night before the trial. He stated that the use of the forearm to increase pressure on the partner's throat was an effective form of erotic asphyxiation. Dr. Schwartz said that a distinguishing feature of a crime scene involving erotic asphyxiation as opposed to suicide or homicide by strangulation was the presence of ligatures or sexual devices such as dildos and whips. Dr. Schwartz said that participants in the activity were almost always involved in other excitement inducing activities such as riding

motorcycles or deviant sexual activities such as swingers clubs. Body piercing was also common among participants of erotic asphyxiation.

Dr. Schwartz said that Defendant's explanation of the use of hand signals to control the application and release of pressure around the neck supported his credibility because someone who had not engaged in erotic asphyxiation would not grasp the significance of anticipating a signal for release. Dr. Schwartz explained that the problem with the system described by Defendant was that the partner waits longer and longer before signaling release, and it was a "lethal kind of system that they used."

Dr. Schwartz stated that as a result of his interview with Defendant and review of the material which had been introduced into evidence, it was his opinion that the victim's death was an accident due to erotic asphyxiation.

On cross-examination, Dr. Schwartz verified that he was not a medical doctor.

## II. Sufficiency of the Evidence

In reviewing Defendant's challenge to the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The offense of second degree murder is defined as the knowing killing of another. T.C.A. § 39-13-210. A person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-11-302(b).

Dr. Carter testified that the victim's cause of death was manual strangulation. Dr. Carter said that there was not enough water in the victim's lungs to suggest that the death was caused by drowning. The victim's physical injuries included pervasive petechiae, contusions on either side of the neck, and patchy hemorrhaging in the neck muscles and pharynx which Dr. Carter testified were consistent with death by manual strangulation. Dr. Carter also testified that the victim's physical

injuries were not consistent with strangulation by choke hold. Defendant did not contend that he was not present in the house when the victim died, or that anyone else, other than Defendant's two young sons, was present. The jury heard Defendant's theory of defense that the victim accidently drowned in the bathtub following her engagement in the practice of erotic asphyxiation and, by its verdict, obviously found this explanation not credible as was their prerogative. Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of the offense of second degree murder. Defendant is not entitled to relief on this issue.

## III. Evidentiary Rulings

Defendant argues that the trial court erred in admitting evidence of prior bad acts and hearsay statements. The challenged evidence was presented through Ms. Woods' testimony concerning Defendant's assaults against her in June and September 2004, and Ms. Cole's and Ms. Harden's testimony concerning Defendant's assaults against the victim in 1995 and 1996. Defendant also argued that the trial court erred in permitting the State to question Ms. Woods about her knowledge of Defendant's prior convictions in 1990 and 1992.

Prior to trial, the State filed a Notice of Intent to Present Evidence of other Crimes, Wrongs and Acts which listed the 1996 incident and the two 2004 incidents, but not the incident occurring in 1995. *See* Tenn. R. Evid. 404(b). Defendant filed a motion in limine in response to the State's notice, requesting that the trial court exclude such evidence because the evidence of prior bad acts was highly prejudicial and the danger of unfair prejudice outweighed its probative value. The State also filed a Notice of Intent to Seek Enhanced Punishment and Notice of Impeachment Convictions which reflected Defendant's prior convictions in 1990 and 1992.

The trial court conducted a Rule 404(b) hearing prior to the selection of the members of the jury panel during which defense counsel reiterated his contention that the evidence was not relevant and was highly prejudicial. The State argued that the theory of defense advanced thus far was that Defendant was asleep while the victim took a bath, and that the victim was dead when he woke up. Defense counsel stated that it was Defendant's "intention to put forth a defense that this was an accidental homicide" that occurred during "what is commonly called 'rough sex.'" Based on this defense theory, the trial court initially found that the proposed evidence was highly relevant to show identity, and that its probative value was not outweighed by any unfair prejudice. The trial court, however, stated:

> [b]ut having said all that, in my opinion this proof is only appropriately used in rebuttal. I'm going to preclude the State from getting into it in the case-in-chief because we don't really know what the defendant – the defendant isn't required to tell us right now what he's going to present and what he plans to develop. There have been suggestions obviously, but until we know for certain what the defense is, its not
> . . . .

At this point, defense counsel acknowledged that he had informed the State that morning that the defense planned to called an expert witness to testify on Defendant's behalf about erotic asphyxiation. Defense counsel stated that they intended to argue that the victim's death resulted from an accidental killing during her participation in erotic asphyxiation. Defense counsel also informed the trial court that they planned to voir dire the prospective members of the jury panel on the issue of erotic asphyxiation.

The trial court found that if the proposed theory of defense as presented during voir dire and in opening statement was an accidental killing, then the State "should not be precluded from responding to that," and could, therefore, present the Rule 404(b) evidence in its case-in-chief.

During voir dire, defense counsel told the prospective jurors that they would hear the term, "erotic asphyxiation," that they would hear about certain sexual practices between Defendant and the victim, and that a psychologist who specialized in the field of deviant sexual behavior would testify to explain the behavior. The prospective jurors indicated that they would be able to fairly accept this evidence without bias against Defendant's lifestyle.

During opening argument, defense counsel informed the jury that it would hear about the practice of erotic asphyxiation from "a well-known national sex expert." Defense counsel stated:

> [a]nd in this erotic asphyxiation, again the object simply being to gain the highest arousal that one can possibly achieve through being giddy or light-headed while you're having sex, undergoing choking. Now it's a very risky sexual experience but the parties again, not passing any judgment on morality or what they do in their bedroom, but the parties assume that risk. They take that risk. They share that risk. And let me quickly point out and hasten and say with emphasis that as part of that erotic asphyxia experience, it's no intent on the part of either party for a death to result. The death results accidently as it did in this case. . . . Now one thing . . . I do want to point out is that the proof is going to show that [Defendant] had a girlfriend. But the proof also is going to show that [Defendant] and his girlfriend[,] Ms. Woods[,] themselves indulged in that asphyxiated sexual erotic experience, that they were somewhat involved in the practice. . . . And the reason we're talking about the girlfriend in terms of what the proof is going to show is because it will show you – it will open up more, this whole weird or kinky world of asphyxiation.

### A. Assaults Against Ms. Woods in 2004

Ms. Woods testified during direct examination that she talked with the victim in June 2004, after Defendant had put his hands around Ms. Woods' neck during an argument. Ms. Woods said that Defendant applied pressure to her neck with both hands while he told her not to call him anymore. Ms. Woods described a second argument involving Defendant placing his hands around her neck which occurred in September 2004. Ms. Woods subsequently testified that she did not know what the term, "erotic asphyxiation," meant, but acknowledged that Defendant sometimes

-14-

placed his forearm around her neck during sexual intercourse, and sometimes applied pressure, but not unduly so.

Rule 404(b) of the Tennessee Rules of Evidence provides as follows:

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person or to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

A fourth prerequisite to admission is that the court find by clear and convincing evidence that the defendant committed the other crime. *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005) (citing Tenn. R. Evid. 404, Advisory Comm'n Comment; *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997); *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985)).

While evidence of a prior crime, wrong, or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, intent, motive, opportunity, or absence of mistake or accident. *See State v. Shropshire*, 45 S.W.3d 64, 75 (Tenn. Crim. App. 2000). Where the trial court has been called to pass upon the admissibility of evidence of other crimes, wrongs, or acts under Rule 404(b), its determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652).

Defendant argues initially that the trial court failed to find by clear and convincing evidence that Defendant actually committed the assaults against Ms. Woods. The State contends that Defendant "essentially conceded the truth of [Ms.] Woods' testimony" by contesting only the testimony's probative and prejudicial value.

The trial court determined in a jury-out hearing that a material issue existed other than conduct conforming with a character trait and placed the reasons for such on the record as noted previously. Further, the trial court determined that the prejudicial effect of the evidence was outweighed by its probative value. Although the trial court did not make an explicit finding that the evidence clearly and convincingly showed that the assaults against Ms. Wood occurred, Defendant did not contest or make a specific objection to the accuracy of Ms. Woods' testimony in this regard. *See State v. Michael Bailey*, No. W2005-01815-CCA-R3-CD, 2007 WL 763212, at *5 (Tenn. Crim. App., at Jackson, Mar. 13, 2007), *perm. to appeal denied* (Tenn. Aug. 20, 2007) (finding substantial compliance in the trial court's application of Rule 404(b) despite the failure to explicitly find that the proof of the other crime was clear and convincing because the finding was implicit in the trial court's explanation for allowing the challenged testimony); *State v. Ray Anthony Nelson*, No. 03C01-9706-CR-00197, 1998 WL 694971, at * 9 (Tenn. Crim. App., at Knoxville, Sept. 9, 1998), *perm. to appeal denied* (Tenn. Sept. 11, 2000) (finding substantial compliance in the absence of any objection or real issue as to whether the alleged events occurred). Based on our review, we find that the trial court substantially complied with the procedural requirements of Rule 404(b), and our review is thus subject to the deferential abuse of discretion standard.

Relying on *State v. Gilley*, 173 S.W.3d 1 (Tenn. 2005), Defendant submits that the trial court erred in making a Rule 404(b) evidentiary ruling prior to trial. In *Gilley*, our supreme court cautioned:

> [a]lthough Rule 404(b) does not preclude the trial court from conducting a hearing or ruling prior to trial, we share the Court of Criminal Appeals' view that the Rule 404(b) criteria - in particular, the existence of a material issue at trial and the balancing of the probative value and unfair prejudice - require consideration of the evidence presented at trial. Thus, trial courts must be cognizant that if pretrial evidentiary rulings are made, they may need to be reconsidered or revised based on the evidence presented at trial.

*Id*. at 6.

The trial court in the case *sub judice* observed at the end of the Rule 404(b) hearing that it might "revisit the fact of the identity factor later, depending on what the proof proves to be" if Defendant reverted to his initial defense that he did not know who caused the victim's injuries. The fact, however, that the trial court did not subsequently discern a reason for revisiting its pretrial ruling as to Ms. Woods' testimony about the prior choking incidents does not mean that its pretrial 404(b) ruling was error.

Defendant argues that the only purpose for introducing evidence of his assaults against Ms. Woods was as propensity evidence. Defendant was indicted for first degree premeditated murder. The State's theory was that the murder was accomplished through strangulation. The State was required to prove that the killing of the victim was "premeditated and intentional." T.C.A. § 39-13-

202(a)(1). The theory of defense was based on an accidental death which occurred after Defendant and the victim engaged in erotic asphyxiation and after Defendant retired to bed.

As observed below, evidence that a defendant has committed a prior bad act against *the victim* may be admissible to rebut a defendant's theory that the charged offense was an accident. *State v. West*, 844 S.W.2d 144, 149 (Tenn. 1992). In this instance, however, the State sought to show that Defendant had previously choked someone other than the victim while angry to rebut his claim that the victim's death was accidental. Thus, standing alone, the fact that Defendant choked Ms. Woods during an argument on two separate occasions is the type of propensity evidence which Rule 404 seeks to prohibit. That is, when Defendant is angry, he chokes his partner.

However, Defendant sought to demonstrate to the jury his skill at successfully engaging in erotic asphyxiation, and placed his relationship with Ms. Woods at issue by submitting that he and Ms. Woods engaged in erotic asphyxiation in the same manner as he and the victim, and without adverse consequences. Under the facts presented in the case *sub judice*, the State was entitled to rebut this argument by showing that the incidents of choking involving Ms. Woods occurred during arguments and not sexual relations. Ms. Woods testified that she did not know prior to the trial what the term, "erotic asphyxiation" meant. However, Ms. Woods on cross-examination acknowledged that Defendant always engaged in "rough sex." At defense counsel's request, Ms. Woods demonstrated to the jury how Defendant would place his forearm around her neck during sexual intercourse. Ms. Woods stated that on other occasions Defendant would either place both hands around her neck, or place one hand on her neck and one hand on the headboard. Ms. Woods testified that he did so without applying undue pressure.

Based on the foregoing, we conclude that the evidence was probative of both Defendant's intent and to rebut his theory of an accidental killing. Although the evidence was prejudicial, based on our review of the facts presented in this case, we do not find that the prejudice was unfair. Moreover, the trial court gave the jury a limiting instruction as to how to consider this evidence. *See State v. Jordan*, 116 S.W.3d 8, 18 (Tenn. Crim. App. 2003) (observing that jurors are presumed to follow the instructions given them absent evidence to the contrary). Thus, we conclude that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Accordingly, this evidence was properly admitted.

## B. Rebuttal Character Evidence

Defendant argues that the trial court erred in permitting the State during cross-examination to ask Ms. Woods whether she was aware of Defendant's prior convictions and his prior assaults against the victim. Defendant contends that he did not open the door to this type of inquiry by presenting character evidence through Ms. Woods pursuant to Rule 404(a)(1) of the Tennessee Rules of Evidence. Defendant submits that on the contrary, the State's objection was interposed before Ms. Woods could complete her answer, and defense counsel decided to forego the presentation of character evidence. Defendant also argues that the trial court's error was compounded because his prior convictions are more than ten years old.

During Ms. Woods' cross-examination, the following colloquy occurred:

[DEFENSE COUNSEL]:     Now let me take you – let's go backward a bit. I want you to tell this jury, you – from 2002 to 2004 you've been around [Defendant] a whole lot, haven't you?

[MS. WOODS]:     Yes.

[DEFENSE COUNSEL]:     Tell this jury about some of the social events and community activities that he was involved in.

At this point, the State interposed an objection. At a hearing in the presence but out of the hearing of the jury, defense counsel stated that because Ms. Woods had testified as to Defendant's character during direct examination, he wished to "cross-examine her about some of his good character traits." The trial court explained:

[y]ou are welcome to ask the character witness questions if you'd like, but this is not the manner in which to do it. So if you want to ask her if she is familiar with his reputation in the community for the truth and veracity or for peace and quietude, and yes, that's fine. But you can't just launch into some open-ended inquiry into his boy scout days or something.

Cross-examination resumed as follows:

[DEFENSE COUNSEL]:     Are you aware of his reputation in the community?

[MS. WOODS]:     Yes.

[DEFENSE COUNSEL]:     And what would you say it is?

[MS. WOODS]:     He was always trying to lend a helping hand. He organized a ride up in Tennessee . . .

The State again objected, and the trial court told defense counsel to rephrase the question. Defense counsel, however, abandoned the line of questioning and passed the witness. During redirect examination, the State asked Ms. Woods if she knew that when Defendant and the victim lived in Millington, Defendant choked the victim, and that the victim subsequently obtained an order of protection. Ms. Woods responded, "No."

The State then requested permission to approach the bench and sought permission to question Ms. Woods about two other incidents involving Defendant choking or assaulting the victim during an argument. The State acknowledged that the incident involving an argument between the victim and Defendant which occurred in a rehabilitation facility was not included in its Rule 404(b) notice,

-18-

but argued that the evidence was admissible to rebut Defendant's character proof. The trial court held a Rule 405(a) hearing out of the presence of the jury during which the State sought to establish a reasonable factual basis for the inquiries through the testimony of Ms. Cole and Ms. Harden.

After Ms. Cole and Ms. Harden testified at the hearing, the trial court found that a reasonable factual basis existed for the State's proposed inquiries, and that the probative value of the specific instances of Defendant's conduct on Ms. Woods' credibility outweighed its prejudicial effect. *See* Tenn. R. Evid. 405(a). The trial court stated:

[Y]ou may first ask Ms. Woods was she – does she know or was she aware of this incident or this incident for purposes of challenging her credibility as a character witness. And then you're bound by her answer with regard to that.

The trial court also found that the State could ask Ms. Woods whether she was aware that Defendant had two prior misdemeanor convictions under Rule 404(a).

Tennessee Rule of Evidence 404(a)(1) provides:

(a) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except:

(1) Character of Accused. Evidence of a pertinent character trait offered by the accused or by the prosecution to rebut the same.

Rule 404(a)(1) reflects an exception to the general bar on the admissibility of character evidence and permits the defendant in a criminal case to "open the door" by introducing evidence of his or her own character. Neil P. Cohen, et al., Tennessee Law of Evidence § 4.04[a] (5th ed. 2005). Until the defendant takes this step, however, the State cannot introduce evidence of a defendant's bad character to prove that the defendant acted in conformity with that character. *Id.*

When character evidence is admissible under Rule 404(a), Rule 405 provides that "proof may be made by testimony as to reputation or by testimony in the form of an opinion." Tenn. R. Evid. 405(a). If, as the State contends here, the defendant "opens the door" to character evidence by inquiring into a witness's knowledge of the defendant's good reputation in the community, then the State may cross-examine the witness about specific instances of conduct to test the witness's credibility. *Id.*; Cohen, *supra*, at § 4.05[4][a]. The State, however, is bound by the witness's answer and is precluded from introducing extrinsic evidence of the specific acts unless such evidence is admissible on some other basis. Cohen, *supra*, at § 4.05[4][a].

In this case, the trial court followed the procedural mandates of Rule 405. That is, it held a hearing outside the presence of the jury, after which it determined that a reasonable factual basis

existed for the inquiries, and the probative value of the specific instances of conduct on Ms. Woods' credibility outweighed its prejudicial effect on the substantive issue. *See* Tenn. R. Evid. 405(a).

We observe initially that Defendant challenges the State's inquiry into his prior convictions which are more than ten years old. Although he cites no authority in support of his position, and the issue is thus waived, Defendant appears to have failed to distinguish between Rule 609 and Rule 404(a). *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). However, these rules are distinct and have different standards of application and consequences. *State v. Michael Gaines*, No. M2005-01620-CCA-R3-CD, 2007 WL 1203592, at *5 (Tenn. Crim. App., at Nashville, April 24, 2007). Rule 609 allows the State to impeach a witness's credibility by proof that the witness has been convicted of a crime if the prior conviction in question meets certain prerequisites, including the age of the conviction. Tenn. R. Evid. 609. In this instance, however, the prior convictions were offered as rebuttal character evidence. If admissible, Rule 404(a)(1) does not impose an age limitation on the prior convictions used as a specific instance of conduct in rebuttal as long as the evidence is relevant and its probative value on the witness's credibility does not outweigh its prejudicial effect. Tenn. R. Evid. 404(a)(1).

The initial inquiry, however, is whether Defendant opened the door to the presentation of rebuttal character evidence. Defense counsel asked Ms. Woods during cross-examination whether she was aware of Defendant's reputation in the community. Ms. Woods' response that Defendant "was always trying to lend out a helping hand" at most indirectly inferred Defendant's positive status within the community. Nonetheless, the admissibility of rebuttal evidence based on this response presents a close question. However, based upon our review of the record, we conclude that any error in the admissibility of this evidence was harmless. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

Evidence concerning the altercation between the victim and Defendant on April 17, 1996, and the victim's subsequent application for a protective order, had been previously introduced through Officer Wall's and Mr. Mangum's direct examination. Evidence concerning Defendant's prior bad acts against the victim were properly admitted pursuant to Rule 404(b) of the Tennessee Rules of Evidence as discussed below. Defense counsel thoroughly recross-examined Ms. Woods who acknowledged that the victim never mentioned these incidents during their conversation at the fast food restaurant. Based on the foregoing, we conclude that Defendant is not entitled to relief on this issue.

## C. Excited Utterances

Initially, the trial court conducted a hearing pursuant to Rule 405 to determine whether Ms. Cole's and Ms. Harden's testimony provided a reasonable factual basis for the State's proposed rebuttal character evidence. After hearing the testimony, the trial court also found that the victim's statements to both Ms. Cole and Ms. Harden were admissible during the presentation of the State's case-in-chief pursuant to Rule 404(b) under the excited utterances exception to the hearsay rule. The trial court found that these witnesses' testimony concerning the victim's statements and their

observations of the victim was "highly probative of a central issue to this case, absence of accident or mistake," and the probative value was not outweighed by the danger of unfair prejudice.

Although Rule 404(a)(1) does not permit extrinsic evidence of specific incidences of a defendant's prior bad conduct, such evidence may be admitted for other purposes. *State v. West*, 844 S.W.2d 144, 149 (Tenn. 1992). For example, as is the case here, "when a prior bad act . . . rebuts a defendant's theory that the charged offense was an accident or mistake, the trial court may admit evidence of the prior bad act after holding a hearing out of the jury's presence." *Id*. Violent acts indicative of the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show intent, particularly if the defendant's theory of defense is that the victim's death was accidental. *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993); Tenn. R. Evid. 404(b). In this case, the trial court applied the procedural safeguards embodied in Rule 404(b) and found that the proposed testimony of Ms. Cole and Ms. Harden was relevant to a material issue other than conformity and that the probative value of the evidence was not outweighed by its prejudice.

Although the evidence of a prior bad act may be admissible under Rule 404(b), the presentation of the evidence must not run afoul of the other rules of evidence. In this instance, the trial court determined that the victim's out-of-court statements to Ms. Cole and Ms. Harden were admissible under the excited utterances exception to the hearsay rule in that the statements related to a startling event made while the victim was under the stress of excitement caused by the event. *See* Tenn. R. Evid. 803(2).

At the evidentiary hearing, Ms. Cole testified that the victim came to her house in 1997 between approximately 10:00 p.m. and 11:00 p.m. Ms. Cole said that the victim was upset and crying. The victim told Ms. Cole that she and Defendant had argued, and Defendant had pulled her down a flight of stairs by her hair. On cross-examination, Ms. Cole acknowledged that the victim "calmed down" as the two women talked that night.

Ms. Harden testified that the victim called her one day and asked if she could live with Ms. Harden because she and Defendant had argued. One day, the victim went to visit Defendant at the rehabilitation center in which he was a patient. Ms. Harden saw the victim later that evening and testified that the victim had a raspy voice and marks on her neck. Ms. Harden said that the victim "was very upset" and told her that Defendant had choked her during an argument. On cross-examination, Ms. Harden said that she did not know when the altercation specifically occurred. In response to the trial court's questions, Ms. Harden said that the victim was crying, upset, confused and distraught when she saw the victim that evening.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or otherwise by law."). However, the rules of evidence

provide an exception for hearsay statements which meet the conditions of an "excited utterance." Tenn. R. Evid. 803(2).

An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id*. The rationale for admitting an "excited utterance" is that the perceived event produces nervous excitement, which temporarily suspends the capacity to reflect, making the fabrication of statements about that event unlikely. *State v. Gordon*, 952 S.W.2d 817, 819 (Tenn. 1997) (citations omitted). In addition, a statement relating to a startling event is typically made while the memory of the circumstance or event is still fresh, thus creating a more accurate testimonial to the event than would be produced by a later in-court description of it. *Id*. at 819-20.

In order to meet the parameters of the "excited utterance" exception: (1) there must be a startling event or condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress of excitement caused by the event or condition. *State v. Stout*, 46 S.W.3d 689, 699-700 (Tenn. 2001), *superseded by statute on other grounds as stated in State v. Odom*, 137 S.W.3d 572 (Tenn. 2004); *Gordon*, 952 S.W.2d at 820. The time interval between the startling event and the declarant's statement, however, is but one consideration in determining whether a statement was made under stress or excitement. *Stout*, 46 S.W.3d at 700 (concluding that because the trial court had considered all the relevant factors, including the time span between the event and the statement, it was not an abuse of discretion for the trial court to determine that statements made twelve hours after the event were admissible as excited utterances where the declarant continued to be under the stress of the event). The ultimate issue is whether the statement is deemed reliable because of its spontaneity and lack of thoughtful reflection and deliberation. *Gordon*, 952 S.W.2d at 820 (quoting *State v. Smith*, 851 S.W.2d 1, 9 (Tenn. 1993)).

The trial court found that:

> while it's true that [the statements] weren't made instantaneously contemporaneous with the event itself, they are relatively close in time to the occurrence that was testified to. And just as significantly, they were made to individuals in whom the victim had confidence . . . . And in point of fact, in spite of the questions that were asked on cross-examination, both of these witnesses repeatedly maintained that the victim was distraught, crying, upset, at the time these statements were made; not cool, calm and collected. They did state pursuant to questioning that the victim was coherent but nonetheless upset and crying and exhibiting the type of emotion and conduct that would lend that indicia of reliability to the statements that the victim was making at the time . . . [.]

The record indicates that the trial court considered all of the relevant factors, including the passage of time, in making its ruling. Based on our review of the record, we conclude that the trial

court did not abuse its discretion in allowing the presentation of this evidence. Defendant is not entitled to relief on this issue.

In a related issue, Defendant argues that the trial court erred in allowing Ms. Cole to testify because she was present during the trial prior to her testimony in violation of Rule 615 of the Tennessee Rules of Evidence, familiarly known as "the Rule."

"At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before *voir dire*, but in any event shall be effective before opening statements." Tenn. R. Evid. 615. The Tennessee Supreme Court has said that "[t]he purpose of the rule is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." *State v. Harris*, 839 S.W.2d 54, 68 (Tenn. 1992) (citing *Smith v. State*, 554 S.W.2d 648, 651 (Tenn. Crim. App. 1977)). We have previously explained the authority of the trial court in considering alleged violations of the rule:

> Rule 615 does not prescribe a specific sanction for its violation. Instead, courts retain the discretion to impose a variety of sanctions appropriate to the circumstances. *State v. Anthony*, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992); *see also* N. Cohen et al., Tennessee Law of Evidence § 6.15[11][b] (4th ed. 2000). The trial court may, as a sanction, exclude the testimony of a witness who hears other testimony while subject to a sequestration order. *See State v. Weeden*, 733 S.W.2d 124, 125 (Tenn. Crim. App. 1987). The decision to exclude or allow the testimony is a matter within the discretion of the trial court, subject to a showing of abuse and prejudice to the complaining party. *State v. Chadwick*, 750 S.W.2d 161, 166 (Tenn. Crim. App. 1987).

*State v. Black*, 75 S.W.3d 422, 424-25 (Tenn. Crim. App. 2001).

In the case *sub judice*, the prosecutor informed the trial court that she had attempted to interview Ms. Cole and her husband about any knowledge they might have about the offense, and Ms. Cole refused to talk. The prosecutor stopped the interview and informed Ms. Cole that she would not be called as a witness. Ms. Cole was thus permitted to remain in the courtroom for the first two days of trial. The prosecutor said that on the second day, Ms. Cole left the courtroom and asked to speak to the victim-witness coordinator out of the presence of her husband. Ms. Cole explained that she could not talk about the offense in front of her husband because she was afraid of his and his family's reaction to her proposed testimony. Based on these circumstances, the trial court permitted Ms. Cole to testify at trial. Defendant has failed to show any prejudice resulting from Ms. Cole's presence in the courtroom prior to her testimony. After review, we conclude that the trial court did not abuse its discretion in allowing Ms. Cole to be called as a witness. Defendant is not entitled to relief on this issue.

## IV. Sentencing Issues

Defendant contends that the trial court erred in setting the length of his sentence based on the amount of mitigating evidence presented and the presence of only one enhancement factor.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d). This presumption is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id*. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely de novo. *Id*. If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determinations the trial court must consider: (1) the evidence presented at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; (6) the defendant's potential or lack of potential for rehabilitation or treatment; and (7) any statements made by Defendant in his own behalf. T.C.A. §§ 40-35-103 and -210; *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

Defendant's sentencing hearing was conducted on January 6, 2006. Our legislature recently amended several provisions of the Criminal Sentencing Reform Act of 1989, which amendments became effective June 7, 2005. The Act provides that defendants who are sentenced after June 7, 2005, for offenses committed before that date may elect to be sentenced under the provisions of the Act, as amended, by executing a waiver of the defendant's ex post facto protections. 2005 Tenn. Pub. Acts ch. 353, § 18. The record reflects that Defendant committed the offense prior to the effective date of the amended provisions of the Sentencing Act, and the record on appeal does not contain a waiver indicating Defendant's wish to be sentenced under the Act as amended. Thus, Defendant was sentenced under the sentencing statutes in effect at the time the offense was committed.

Defendant was convicted of second degree murder, a Class A felony. As a Range I, standard offender, Defendant was subject to a sentence of between fifteen and twenty-five years. T.C.A. § 40-35-112(a)(1). Under the applicable law, the presumptive sentence for a Class A felony is the midpoint of the range, or twenty years. T.C.A. § 40-35-210(c).

At the sentencing hearing, the State relied upon the presentence report and a victim impact statement which was prepared by Ms. Washburn. Neither the presentence report nor the victim impact statement is included in the record. Ms. Washburn, however, read her statement into the record at the sentencing hearing. In her statement, Ms. Washburn described the effects of the

victim's death on the victim's children and other members of her family and described the victim's community and church activities. We glean from the record that Defendant's prior criminal convictions include a 1992 conviction of theft of property under $500 and a 1990 conviction of simple assault. Defendant also submitted for the trial court's consideration certain letters written on his behalf in connection with his pre-trial bond hearing and requested the trial court to take notice of the testimony presented at the bond hearing from Defendant's employer, Dr. Ruby Payne, and other persons who described Defendant's character and his work in the community. Neither the letters nor the transcript of the bond hearing are included in the record on appeal. *See State v. Charles Humphries*, No. W2005-00016-CCA-R3-CD, 2006 WL 561414, *6 (Tenn. Crim. App., at Jackson, Mar. 7, 2006), *no perm. to appeal filed* (observing that "[c]ertainly, the presentence report is vital in appellate review of the trial court's imposition of consecutive sentencing; therefore, in its absence, we presume the accuracy of the trial court's findings").

At the conclusion of the sentencing hearing, the trial court considered in mitigation of Defendant's sentence, his education, his responsible job, the numerous character letters, and the testimony of witnesses on his behalf at the bond hearing and the trial. The trial court applied enhancement factor (2), that Defendant has a previous history of criminal convictions. T.C.A. § 40-35-114(2) (2005). The trial court considered both Defendant's assault conviction and his theft conviction very "relevant" in its sentencing determinations. The trial court also observed that Defendant's offense was "heinous" and "required considerable effort" to commit and "that was followed up by some very defective [sic] and questionable conduct on his part as borne out by the proof in the bond hearing and the trial."

The trial court continued:

[a]nd I think was well this isn't an enhancement factor . . . but just as an observation there's been little of what I would consider to be genuine remorse expressed in this case. Notwithstanding his conduct on the witness stand during the trial I think if one were to listen to those tapes of those phone calls from the jail one would have to question the degree of remorse that [Defendant] exhibited with regard to this offense.

Considering both the mitigating factors and the one enhancement factor based on Defendant's prior convictions, the trial court sentenced Defendant to twenty-four years.

Our supreme court has recently concluded that other than a defendant's prior criminal convictions (or other enhancement factors admitted to by the defendant), the application of enhancement factors by the trial court rather than a jury, which increases the defendant's sentence beyond the statutorily presumptive minimum sentence, deprives the defendant of his or her Sixth Amendment right to have a jury determine whether those enhancement factors apply. *State v. Gomez*, ___ S.W.3d___, 2007 WL 2917726, at *6 (Tenn. 2007) (citing *Cunningham v. California*, 549 U.S. ___, 127 S. Ct. 856, 860, 166 L. Ed. 2d 856 (2007)). Thus, consideration of Defendant's prior misdemeanor convictions "does not offend the Sixth Amendment." *Id*.

Faced with this one enhancement factor and the mitigating factors advanced by Defendant at the sentencing hearing, the trial court was required to start at the midpoint of the range, or twenty years, enhance the sentence within the range as appropriate for the enhancement factor, and then reduce the sentence within the range as appropriate for the mitigating factors. T.C.A. § 4-35-210(e). The trial court acknowledged Defendant's positive attributes of education and employment but considered Defendant's prior criminal history as very "relevant" in its sentencing determinations.

Defendant argues that his two prior misdemeanor convictions, which occurred more than twelve years before the charged offense, do not support a sentence of twenty-four years. Defendant submits that the trial court erroneously relied on non-statutory factors, such as the trial court's conclusion that Defendant had not been truthful at a pre-trial bond hearing and the trial court's observation that Defendant exhibited little remorse, in determining the length of his sentence.

Although only one enhancement factor is applicable, the weight assigned to that factor is left to the discretion of the trial court so long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. *State v. Gosnell*, 62 S.W.3d 740, 750 (Tenn. Crim. App. 2001) (citing *State v. Moss*, 727 S.W.2d at 238; *State v. Leggs*, 955 S.W.2d 845, 848 (Tenn. Crim. App. 1997); T.C.A. § 40-35-210 Sentencing Commission Comments). A defendant's personal circumstances and the circumstances surrounding his criminal conduct may be considered by the trial court in the determining the weight which is given to an applicable enhancement factor. *State v. Hayes*, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995) (citing *Moss*, 727 S.W.2d 229, 238 (Tenn. 1986)); *see also State v. Anderson,* 985 S.W.2d 9, 20 fn.1 (Tenn. Crim. App. 1997) ("[T]hough not a separate enhancement factor, a defendant's lack of truthfulness may be considered in determining the weight to be given to an applicable enhancement factor.")

Based on our review of the record, the trial court complied with the purposes and principles of the sentencing act in determining the weight to be accorded this enhancement factor, and its findings are supported by the record. Thus, we conclude that the trial court did not abuse its discretion in assigning great weight to the one applicable enhancement factor and minimal weight to the applicable mitigating factors, and sentencing Defendant to twenty-four years for his conviction of second degree murder. *See Gomez II*, 2007 WL 2917726, at *8 (observing that the extent of the weight placed on the defendants' history of prior criminal convictions may well justify the imposition of the maximum sentence for all convictions). Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE